We now go to United States v. Jiang. Thank you, Councilor. Good morning. I'm Corrie Hong, and I represent Mr. Jiang, who's the defendant appellant in this case. The question asked by the agent... Public defender... No, private counsel. The question asked in this case was, quote, I asked him about the current standing of his application and when he intends to export. The answer, according to the agent, is, quote, Mr. Jiang stated that the export application was canceled, the order was canceled, and he returned the product to the manufacturer, Narda, unquote. The government's theory is that this exchange is sufficient to put Mr. Jiang on notice that the ad agent was asking for the whereabouts of all nine amplifiers and whether Mr. Jiang had in fact sent any product to China. The government's theory also is that this exchange is sufficient to show that Mr. Jiang communicated that he denied exporting three products to China. There are five problems as to why the record is insufficient to show that the record shows that there's insufficient evidence that this conviction can be supported. The first, and I would like to remind the court that the court only has to agree on one of those arguments in order to reverse Mr. Jiang's conviction. The first argument is that this is a literally true statement. The agent asked about the present and future activities of Mr. Jiang. In response, Mr. Jiang returned that he returned product to the manufacturer, which in fact he had. Also, Mr. Jiang said that the application was canceled, which is true under two theories. Either A, it was rendered moot because the nine amplifiers in this application had either been sent to China or returned to the manufacturer, but also as described to the grand jury, the agent said that the contract was canceled because it was taking too long. There is no question also that Mr. Jiang's Chinese customer was disappointed at the length and had stipulated that the product must be returned by a particular date or the contract would be canceled, and this in fact happened by the June interview with Mr. Jiang. Under Braunston, there is this analogous situation wherein the prosecutor asked the defendant, have you ever, unquote, to which the defendant there answered that a company had an account in the Swiss bank account for about six months in Zurich. The Supreme Court held that there was sufficient disconnect between that particular question and that particular answer to prove that the defendant in Braunston, in fact, was denying that he ever had personal accounts in the Swiss bank. Similarly, there is a disconnect here between Mr. Jiang's answer and the question asked. The question asked referred to whether or what was the current standing of the application, and Mr. Jiang answered that the product was returned to NARDA. The Supreme Court has held that that statement cannot be construed into a negative inference to say that Mr. Jiang, in fact, denied exporting products to China. Absent that expressed language to the court. Kagan. Are you relying at this point on the agent's written account of what the questions were or his testimony or both? It's a little confusing as to, because he doesn't say exactly the same thing at different times. That is precisely one of the questions that we bring up as a due process question, that one of the problems with this conviction is that the agent does not have a consistent recollection as to what question was always asked and which was answered. In this respect, I refer to the question and answer that he gave in testimony, which, according to the agent, was simply that the application was canceled, the order was canceled, and the product was returned to the manufacturer. I'd like to point out to the court that the agent never testified that he either asked the number of amplifiers or that Mr. Jiang specified the number of amplifiers that were the subject of the return to the manufacturer. Two things. One is, wasn't there a disclosure later, a written disclosure, the before or after, that showed that three of the items were not returned and sent to China? At the time of the interview, Mr. Jiang produced, affirmatively produced, a statement showing that there were six amplifiers returned to the manufacturer. And this goes to my second point, that the question as to whether the product was returned is a fundamentally ambiguous question, because the agent testifies that when he said the word product, he meant all nine products, whereas Mr. Jiang said when he said product. But I got one other question. I'm not sure. Was the original purchaser the one who took the three items? Yes. Okay. But that was okay. He said I'd take three, but I don't want the rest of them. Yes. Okay. And then to get back to the fundamentally ambiguous point, when there's a question as to what the defendant meant when he said the word product, Camper counsels this Court to look at extrinsic evidence. Under that test, it's important to look at the documents Mr. Jiang produced at the time of the interview, which indisputably show that he only returned six products. Under that case law, under Camper, then Mr. Jiang's statement has to be construed meaning only six products were returned. This is the second reason as to why there's insufficient evidence to show that Mr. Jiang was saying that he returned all nine products, which is the allegation of the agent and the government. The third reason why there is insufficient evidence is that the materiality element is not met in this case. What is notable is that the agent said he launched further investigation after he received a phone call from the manufacturer who said, Mr. Jiang only returned six products to me. That was sufficient information for the agent to be concerned about where the other three products were. I don't understand what it has to do with materiality. Why isn't it material? Because the agent testified he would have closed the investigation had Jiang actually sent all the amplifiers back to NARS. I mean, doesn't this render Jiang's testimony material? Well, it would be material, but I think Camper then shows that you have to look at the It seems to me this issue washes out. I mean, either we agree with you on the rest of it, but if he had actually literally said, I didn't send anything to China or everything I sent to China was returned, and that seems plainly material as to whether the investigation would have continued. I mean, your argument is it isn't what he said. That's a different problem. But if he had said it, it would have been material, no? Well, the false statement case law makes clear that can only apply not to omissions, not to None of that has to do with materiality, though. So let's go on. All right. Okay. Moving on to intent then, the district court felt that Mr. Jiang expressed an intent to deceive because he felt cornered when he received the phone call. And the district court said that he clearly knew what the interview was about, and he was trying to cover up his failure to get a license. Saints clearly provides that the district court cannot rely on conjecture alone when determining whether a defendant has the intent to lie to the government agent. And in this particular instance, what the evidence shows is that the district court acquitted Mr. Jiang of export violations because he did not have the intent or knowledge. And moreover, the only reason why the government denied the application six months later in October 2002 is that they believed that the product was being sent to the Chinese military facility. I have a question about that. It's very odd in the record. I understand that the application had a four-digit number, but the documents that he submitted along with the at the time of the interview actually had a three-digit number. It had 589, and he wrote it in his hand. So why do we come to the conclusion that they made a mistake about that? The judge never found there was a mistake about that. Right, right. The judge never found. Just a minute. My second question is does this matter in any way? Does the mistake matter? The government made a mistake about the address. I think it does because it shows that there was no export violation for which he. But did you recognize that the document that Mr. Jiang submitted along with at the time of the interview has 589, not 5889? I am not. In hand, as I understand it. Let me look at that right now. I believe that one of the first documents that he submitted had to do that he had to go to the middle person in China. Oh, yes, I do see that that was 589 on ER-13. I believe that there was. I would contend that ultimately the mistake was that the government never investigated whether the end user was, in fact, the Chinese military as was brought out at the trial. I can't say now, and the judge never said that it was really a mistake. We don't know if it was a mistake. The bottom line is we don't know if it was a mistake. With respect to the address or the end user? The address and, therefore, the inference that it was going to at least the place where the military, an address where there was a military operation. Well, I think one thing that's notable about the point is that the agent said that he never confirmed or denied after being told that it was actually for a commercial purpose or a U.S. subsidiary, that he never confirmed or denied that fact by calling the U.S. subsidiary or calling the Chinese military or conducting any other investigation to determine exactly which address it was going to and what the use would be. Well, I don't think that. You know, the agent was trying to find out whether there was a violation, so I think that argument really doesn't have as much weight as some of the others. I wanted to ask you one other question. If your client is not in jail, is he? No, he's not. He's under supervised release. Okay, so. The fifth reason, which brings up a due process reason, is that there was never a meeting of the minds in this particular situation. As Judge Berzon alluded to earlier, that there's not a clear record as to what the exact question asked was and what the exact answer was. The agent does not have a clear recollection as to whether he asked the number of amplifiers in question. He does not have a clear recollection of whether he asked about the contract or the application and whether that was canceled, and he does not have a clear application as to ‑‑ I'm sorry, he has no explanation as to why his report only used the singular. I have a question on whether there's sufficient evidence to support the conviction, not a due process thing. That's the way I look at it. Am I right or wrong? Well, I'm happy to have you resolve this on simple ‑‑ I'm not resolving it, but I just don't see a due process unless, you know, any conviction without evidence is a violation of due process, but you usually don't get to that point. Well, the court can resolve this on any of the prior three elements, but if it does want to go to the due process argument. Did the district judge ever make a finding as to what the question was and what the answer was? Yes. The district court's finding is he actually only made a finding as to the answer, and that was, quote, the expert application had been canceled and that product was returned to NARDA, which was not true. And what page is that on? From the reported transcript, 1046, I think to 47. What transcript number? RT 1046 to 1047. All right. And that also points that under the case law by the Ninth Circuit, the district court has to make a finding when there are two ‑‑ the district court has to determine which one, in fact, was made and as to why it was made. The district court also erred by failing to do that in that situation. Returning to the due process argument, which I'd like to emphasize the court does not have to reach, I would like to emphasize what's unique about this case is that we have ‑‑ Let me just go back to what the judge said. He said the expert application had been canceled. Now, whether the expert application had or hadn't been canceled, that couldn't be material because presumably that the ‑‑ and that was a fact that the government would know, whether the expert application was canceled or wasn't canceled. Right? In other words, whether the expert application, which I assume means the application of the Commerce Department, was or wasn't canceled, I mean, if he said it was canceled, the government had in its hand the application and neither was or wasn't canceled. Right. And at the time of the interview, it was not canceled. Right. So the relevant piece is that the product was returned to NARDA, which was not true. Yes. Okay. Go ahead. And then one layer to consider is that there was a language barrier that was throughout this interview. Well, I'd like to ask about that. As I understand the record, Jane was a professor in the United States for several years and he only used an interpreter sparingly during the trial. And don't these facts support the conclusion that he did have some command of the English language and was good enough for him to understand the questions of Agent Spelsy? What is your response to that? Well, he was not a professor of the English language. He was a professor of marketing. And also, all of his trial testimony occurred three years after the time of the interview. Moreover, the agent testified that at the time of the interview, which is a relevant point, Mr. Zhang's English was, quote, poor and his grammar was broken. When determining whether Mr. Zhang made a false statement, it's highly significant about whether he said amplifier or amplifiers. And to the extent that there's a language barrier that does not clarify whether a person, a native speaker, says the word amplifier means a singular or plural, this is compounded by the agent failing to have a recorded transcript or make contemporary notes as to what exactly was asked at this interview. With the Court's permission, I would like to reserve time. Thank you very much. Ms. Hartley-West. I'm an assistant U.S. attorney, and I represent the United States in this case. I'd like to first address a question that the Court had regarding whether, in fact, there was a mistake. And, in fact, there was not. The application that Mr. Zhang submitted that was received by the Department of Commerce, which is in the government excerpts of record at page 214, shows three digits, 5, 8, 9. Now, we know that. Okay. But that doesn't say the government didn't make a mistake, because, in fact, the shipment that actually went out never went to the military. It went to a private person. That's where the mistake is. Well, in fact, that is not a finding that is made, and it's not in the record. But an Internet search of this customer, Hebei Far East, Paris, does show that it goes to the exact same address, 589 West Zongjiang Road. That is the 54th Research Institute. They do have the same address, which can be confirmed on the Internet. A lot of people have the same address. Was this all in Shanghai? No, it wasn't. It could be a big building. We have no idea. That's true. And the district court found that the government did not prove that it was actually used for military purposes, but it was an address of 589 that triggered the government's investigation. Now, what was it that was sent over here? I'm not sure I know even what it was. These are microwave amplifiers, and that goes exactly to the point that I think was misstated by counsel, that the reason it doesn't really matter what address it was sent to is because these microwave amplifiers, regardless of whether it's just who it was who was buying it, are controlled for export to China. The reason for that is national security reasons. These types of microwave amplifiers, the evidence was, can be used for purposes that are... But the judge found that there wasn't evidence beyond a reasonable doubt that Mr. Zhang knew that and therefore acquitted him on that account. That's correct. But regardless, an export license application, an export license was required here, regardless of who the ultimate customer was. Well, he was found not guilty of that. We have to say that he didn't know it. That's right. But those are two separate cases. Now we'll talk about whether or not the government proved or really made a false statement. And that's a long stretch, if you don't mind my saying so. So we've got a little hill to climb, so try to climb it. All right. I don't mind your saying so, and let me climb that hill right now. Okay. So the first thing is the context here. From the agent going into this interview, he knows that the export application, the license application, had been submitted about two months earlier. A licensing officer had contacted Mr. Zhang with some follow-up questions to get further information about the end user. And then Agent Fels goes in to interview him to find out the status of this export application. He has no way of knowing at that time that, in fact, almost immediately upon submitting the export license application, Mr. Zhang then went ahead and actually exported it. But he would have known it if he'd read the pieces of paper that he, that Mr. Zhang was told to bring with him and did bring with him. Well, one of those papers that Mr. Zhang did not provide is the evidence, the shipping documents showing that, in fact, he did export them. And that's exactly what he was asked to do. The documents demonstrated, as I understand it, that he applied for nine and that he returned six. Right? So if he'd read the documents, he could have very simply said, and where are the other three? He could have. But he didn't read them. He could have. But what we have is the statement that actually was made. And the statement that was made is enough. It is enough for a false statement conviction, because although more could have been asked and more could have been answered, what he said was not literally true. And that is enough for a false statement conviction. It may not have been literally true, but it was at least ambiguous. Because when you use the word, if it was actually said the way, at least the written report says it was said, it was said in the singular, the product and the amplifier, and who knows what that means. Well, okay. Let's take it as ambiguous. The ambiguous, if you look at it that way, testimony, excuse me, was that Mr. Zhang stated that the export application was cancelled, the order was cancelled, and he returned the product back to the manufacturer. Sorry. The substance of that statement is if the export application was cancelled and the order was cancelled. Where does the order was cancelled come from? Was that in the question? This is all a question. The testimony about what Mr. Zhang responded. Was that what he said or was the question? It was a question to which he answered something, right? The question was I asked him about the current standing of his application and when he intends to export. The answer was Mr. Zhang, quote, stated that the export application was cancelled, the order was cancelled, and he returned the product back to the manufacturer. Now, with that answer, there's really no reason for Agent Spelsy to ask anything else, because he's being told, oh, the application was cancelled, the order was cancelled, I returned the product. He had no reason to think that Mr. Zhang, in fact, exported some. The documents, I know the Court is going to ask about, well, the documents don't show what he was asked to bring. He was asked to bring all documents relating to this transaction. He certainly had the shipping record showing that he exported three. Did he provide it? No, he did not. That was to bolster his lie. All right. The opposing counsel cited the Sens case, S-A-I-N-Z, and you didn't respond at all. And the Sens case said precise questioning is imperative as a predicate for the offense of perjury. A witness cannot be forced to guess at the meaning of the question to which he must respond upon burial of perjury. In this case, as soon as the questioner narrowed the focus of the questioning to the information asked, he thought the defendant gave a literally true and responsive answer. Now, in such a case, can the questioner plumb the fruits of his prior ambiguous question through a perjury prosecution? What troubles me in this case is that it was ambiguous. It appeared to be ambiguous and to lead to a charge of actual perjury. Well, I understand your point. In this case, not much of a distinction. Perhaps it's a false statement case, so we don't have perjurious quotations from Mr. Jang of what exactly he said. We have the agent's testimony about it. But the Sens case, like the Bronson case on which Sens relies, is different because the Camper case, which is a Ninth Circuit holding from 2004, says that the Bronson analysis, the literally true defense, applies only where a statement is indisputably literally true and is unresponsive. And the reason for that is because an unresponsive answer is supposed to put the questioner on notice that he's being misled so that he can then ask a follow-up question. Well, what about the use of the terms of product? Doesn't that have the same function? Well, I don't think it – I think it is response. Somebody says the product wasn't – isn't the immediate response. What does he mean? Does he mean all of it or some of it? Taken in conjunction with the rest of the statement, no. The statement as a whole says that the export application was canceled and the order was canceled and the product returned. So taking that statement as a whole, that can only mean I didn't export anything. I gather his testimony was that the order was canceled and he then talked them into taking a little of it back. Well, if we're going to – two things there. One is the order was not canceled. At best, it was perhaps modified because the – he actually shipped, exported four of these amplifiers. The customer ended up accepting three. But I thought his testimony was because it was delayed, they canceled it. But then I essentially renegotiated and talked them into taking some of it. That is what his testimony is. And it's interesting also to note that his testimony was not, oh, I meant when I told the agent that I only returned some of the amplifiers. His testimony was also not, I misunderstood what he was saying. My English isn't very good. I didn't really understand. There was a miscommunication. No, his testimony was very different. His testimony, his defense was the topic never came up. The agent only asked me about the 54th Research Institute. He never asked me about the status of the export application or whether I had exported anything. He says the whole topic never came up, and that is flatly false, and that demonstrates the falsity and the intent to say a lie. Does it matter at all that the district judge's finding as to what he said was that the export application had been canceled, that the product was returned to NORDA? He doesn't say anything about the order having been canceled. No, I don't think it does matter. Why not? Because that is saying the exact same substance of what the court said. Well, it's not the exact same because you are focusing on the court. I mean, there's a lot of fluidity here about exactly what was said. So if we're going to deal with anything at this point, don't we have to deal with what the district court found? We do. And what the district court found says nothing about the order being canceled, so let's wash that out. Therefore, what it says is the application had been canceled and the product was returned to NORDA. Those are the two things that we have to deal with because that's what the district court found. Okay. And both of those are false. All right. The first one may be false, but probably not material. Well, I disagree, Your Honor. It certainly is false because the application was still pending and, in fact, was ultimately denied. All right. And he may have been confused about that, or who knows. But in any event, the government certainly knew whether the application was canceled or not canceled. Well, at least the agent certainly would have had a way of verifying that even if he didn't know it's sitting there. Well, he must have known it at the time he walked into the room. That's why he was interviewing him. But it is still material because the test of materiality is forward-looking. The test of materiality is whether a statement would have a natural tendency to influence or be capable of influencing the decision of the decisionmaker. And a statement that the export application has been canceled clearly intended to ---- What it intended to is one thing, but it would not ---- given the fact that the government knew the answer to the question, that he would have known the government knew the answer to the question, it was a useless thing to try and mislead anybody about. Well, but the test for ---- excuse me. The test for materiality is not, in fact, whether somebody was actually misled. I understand that. But it was whether it would have had any tendency to mislead anybody. Well, you know, if somebody is sitting there with the information, you know he has the information. There's no point in telling him something contrary to what he already knows or can find out by pushing a button. Well, I think ---- I disagree, Your Honor. I understand your position, but I disagree. I think that the test of materiality has to look at what the speaker actually said and whether that itself, independent of whether it did influence and whether the person actually knew it was a lie, if it would ---- if it's inherently capable of influencing. And I think that it was. Does it have to be intended to mislead somebody? Does it have to be intended to mislead somebody? A false statement? Yes. For a 1001 conviction, yes. He has to have the intent. All right. Well, that's why I'm saying I don't understand how it could have been intended to mislead anybody from the fact that the government knows whether the application is there or not. Why would anybody lie to the government about something that it has in its hands and intending to mislead them? Perhaps Mr. Zhang did not know that the ---- this agent would have the ability of verifying right then. But his statement that it was canceled, in fact, was false and ---- So let's say if we push that aside, what we ---- and I understand your argument, then we have that the product was returned to NORDA. That's right. Now, if the Court were to view this as ambiguous, which ---- Not that it was shipped or not that anything was shipped to China or anything else, just that the product was returned to NORDA. Okay? Now, he walked in with documents showing that six of them were returned to NORDA but not the other three. So if he'd read the documents, if the agent had read the documents, he would have known what that statement meant. He did not walk in, just to be clear, he did not walk in with documents showing that he did not return the other three. And he did not walk in with documents showing that he had exported the other three. Yeah. But the statement that we're talking about doesn't say anything about exporting. And it would have been perfectly clear if he looked at the documents he walked in to what was returned to NORDA. That six were returned to NORDA. Which brings us to ---- Nine. That would have been plain if he had just read what he walked in with. Perhaps. But that brings us to the ambiguity question. Because when we're looking at the context, the context is not just the documents that he brought in here. The context is, which Camper instructs us to look at, where there's an ambiguity, all of the statements taken as a whole. Now, the statement taken as a whole shows that Mr. Zhang and the agent both understood that Mr. Zhang was saying he was the substance of what was actually in the indictment, that he did not export amplifiers. Because in saying that the export application was canceled, the order was canceled, and the product ---- and he returned the product back to the manufacturer. Again, I think we have to stick to what the district judge found he said, given the fact that there was confusion about what he said. You're adding things to that. And he keeps adding to Camper. In Camper, there was a written false statement and there was no language issue involved. So isn't Camper distinguishable? But it wasn't a language issue. You're correct. And there was a written false statement. Here there's the statement was, I mean, that he submitted was that six were returned. And the government agent could well have asked a question, what happened to the other three, but no question was asked. And there was a focus on the address to which these were delivered or were supposed to be delivered. So it doesn't ---- isn't Camper completely distinguishable? Well, I think that the fundamental holding still applies, but I think that Your Honor is also going to a question that I think is addressed in, I think it was the Sixth Circuit case of Bartle, which talks about you don't need to overlay the quotation from the indictment and the actual testimony to have there be an exact match. And the fact is that in 1001 cases, oftentimes you may have an agent testifying if it's a verbal statement to the agent, rather than, as was in the cases that I was able to find in the Ninth Circuit, a written false statement, such as in Camper and Culliton and the other cases where there were written false statements or perjury where we actually have a transcript. And I was not able to find a case that was dealing in the Ninth Circuit where there was an agent testifying with a verbal statement. But that is what we have with testimony. The testimony, it can be as precise as it can be. And so we have to deal with ---- And that's why we need to abide by what the judge found was said. Yes, Your Honor. So taking out the order aspect of the testimony, if you look at the export application was canceled and the product was returned, had he just said the product was returned, it might have been different, although I still think that we would be in the ambiguity situation where you look at the surrounding evidence and what the evidence was that Mr. Zhang intended and whether they actually understood the same thing. But it's not, I think it's much clearer now that we have the statement that the export application was canceled, because those two statements taken together, the export application was canceled and the product returned, A plus B equals I didn't export. Just touching on the language issue again, the ---- I do think it's important here that Mr. Zhang's defense was not that there was a language barrier, that he didn't understand or that that's not what he meant. That was not something that he ever said when he testified in this case. His defense, again, was just that the topic never came up. Moreover, he had been a professor in the United States beginning in 1990. But you pointed out the time of the interview, I mean, this professorship was three years later. So we look at the time of the interview. Of course. Of course. And his interview happened in 2002. That is about 12 years after he came to the United States where he was a professor. Now, he had gone back to China very briefly in between, but he had been in the United States for over 10 years. After the interview, it was, I believe, three years until the time of trial. Yes, but it was about two years and six months between the time of the charge. And all you're doing is relying on some oral statements. It's a pretty long time to indict on a material false statement when the government hasn't even made a full investigation of what the whole thing was all about. I don't understand. Why was there such a delay in making the charge of a material false statement? That came after the first charge of export licensing. I'm sorry, Your Honor, I don't know the answer to that question. Neither do I. I mean, it's obviously a problem to defend against when you're told, you know, two years and six months later that you said something in an interview that you probably don't remember anymore anyway. Well. It's different when you're dealing with written statements or anything like that. It was certainly within the statute of limitations that it was drawn. And the substance of the charge, I believe, was adequate to put the defendant on notice of what he was being told that he said, even though there was a discrepancy between the agent's testimony and the language of the indictment. It was adequate for due process purposes to put the defendant on notice. I guess, you know, to be frank, and I suspect this is what's bothering all of us, it's sort of hard to figure out why the government went ahead with this. I mean, I understand you had other problems. You had the exporting problem. But this seems to have been tacked on later. And it's at least marginal. So it seems very strange that this went forward. That's just a reaction. It's an actual reaction. Well, I assume that I have about 15 seconds left on the clock in counting. If the court has any further questions. Thank you very much for your argument. It's very useful. Thank you. If I may respond to three quick things that opposing counsel said. First of all, she said, and I think she misstated the record to show that the amplifiers themselves are prohibited under the regulations. At ER 11, the manufacturer said that these products are clean, was the quote. Are what? Clean, which is what he used, implying that there would be no export license needed. Second of all, at the government's record of record at 229, there is the actual denial of Mr. Jing's license. And there, the only reason given was not that the amplifier is prohibited, but quote, the ultimate consignee is not an acceptable recipient. The second point I would like to point out is that- And the reason that matters could only be because of my code of intent. Why would it matter? He was already found not guilty on the exporting charge, so why would that matter for present purposes? It goes to the district court's mistake in it to say that Mr. Jing knew that he had done something wrong and that he was- So intent, essentially. Okay. The second point is that the government said that Mr. Jing denied ever talking about this issue. What Mr. Jing denied, and this is at the government's brief, page 10, is quote, Did you, during that interview, ever claim that you had not, that you had sent all nine transistors back to NARDA? And Mr. Jing said, no, I didn't talk, he didn't talk about that. Transistors are never a part of this transaction. It was microwave amplifiers. Transistors were not involved at any point. The third point is the government's point saying that A plus B can equal a statement that Mr. Jing did not export. That is precisely the argument that Braunston denies. Braunston says that, quote, the government, or that Congress, it does not persuade us that Congress intended to extend the courage of the perjury, which this court has included to be false statement statutes, to answers unresponsive on their face, but untrue only by negative implication. That is our contention as to what the problem is. What about the export application having canceled? That was not true. It was not true, but there are two responses. One, that you pointed out that it's not material. The second, if you look at the report, which Camper instructs us to do, the agent records that the application was canceled because it was, quote, taking too long. As we know, that the contract was taking too long, and that was canceled at the grand jury testimony. The same agent said that it was the contract that was canceled. When asked to explain why he used contract in the grand jury and the distinction between these two words did not matter. Contract or order in contract? I believe it was contract and application, which is at RT 370 and 371. I see. Okay, thank you very much. And thank both of you for a really useful argument and an interesting case. Thank you. The last case of the day is United States versus Race, R-E-Y-E-S. The case of United States versus Jang has been submitted.
judges: Bright , D.W. Nelson, Berzon